IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2021

## IN RE CHRISTOPHER L.

**Appeal from the Chancery Court for Lewis County**
**No. 2019-CV-52        Michael E. Spitzer, Judge**

_____

**No. M2020-01449-COA-R3-PT**

_____

This case concerns the termination of a father's parental rights to his son. The trial court predicated termination of parental rights on the ground of abandonment by failure to visit and found termination of the father's parental rights was in the child's best interest. We have determined that the record contains clear and convincing evidence to support the trial court's findings and affirm the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Richard Henry Boehms, Hohenwald, Tennessee, for the appellant, Brian L.

Caleb David Thomas, Hohenwald, Tennessee, for the appellees, Ronald K.A. and Susan M.A.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Christopher was born in July 2003 to Debra L. ("Mother") and Brian L. ("Father") (collectively "Biological Parents"). Biological Parents relinquished custody of Christopher to Susan M.A. ("Foster Mother") and Ronald K.A. ("Foster Father") (collectively "Foster Parents") in October 2003. The circumstances of this exchange of custody are unusual. Foster Mother took an interest in Christopher when she saw Rita O., Mother's sister-in-law, holding him at the Oktoberfest celebration in Hohenwald, Tennessee. Ms. O. explained to Foster Mother that she had been caring for Christopher for the previous two weeks, and Foster Mother offered to assist Ms. O. with the child if she needed help. Ms. O. communicated Foster Mother's offer of help to Biological Parents, and, although they

were not previously acquainted with Foster Mother, Biological Parents agreed that Foster Mother could take Christopher home from Oktoberfest and take care of him.

A few days after Foster Mother began caring for Christopher, Biological Parents contacted Foster Parents and asked to see Christopher. Foster Mother took Christopher to Biological Parents' home and found the conditions to be unsafe for the three-month-old child. Specifically, Christopher's bed was under an electrical panel with exposed wiring. When Foster Mother pointed this out to Biological Parents, they did not object to Foster Mother taking Christopher back home with her; however, they requested that she bring the child to visit them periodically in the day time. Over the next couple of weeks, Foster Mother took Christopher to visit with Biological Parents until a third person who resided in their home came to the door and told Foster Mother it was not safe for the child to be there for daily unaccompanied visits because Mother and Father slept all day and did not supervise the child.

After this troubling conversation, Foster Mother took Christopher back to her home and did not return him for visits with Biological Parents at their residence. Since October 2003, when Christopher was approximately three months old, Foster Parents have maintained custody of him (except for a brief period of time when Christopher was in the custody of the Department of Children's Services ("DCS") while Foster Parents became certified as foster parents).[1] Neither Mother nor Father have had any consistent, meaningful contact with Christopher since those early visits in 2003.

In March 2019, when Christopher was nearly sixteen years old, Father confronted him at a city park in Hohenwald and told him that Foster Parents were not his biological parents. This interaction was distressing for Christopher, a child with developmental delays and language impairment. Following this encounter, Foster Parents filed a petition to terminate the parental rights of Biological Parents and for adoption.

This matter has a somewhat convoluted history in the juvenile court which we recount insofar as it is relevant to Father's issues on appeal. In January 2004, Foster Parents filed a pro se petition in the Juvenile Court of Lewis County ("juvenile court") seeking emergency custody of Christopher. The juvenile court later amended the pro se petition to include grounds for dependency and neglect. On March 3, 2005, the juvenile court conducted an adjudicatory hearing on Foster Parents' petition for emergency custody. Present at this hearing were Biological Parents,[2] who were represented by an attorney, Christopher's guardian ad litem, Foster Parents and their attorney, and representatives from DCS. On April 21, 2005, the juvenile court entered an order adjudicating Christopher

---

[1] Foster Parents had weekly visits with Christopher while he was temporarily in DCS custody.

[2] At the time of the hearing, Father was incarcerated but was transported to the hearing and attended in person.

"dependent and neglected within the meaning of the law." The court found that Christopher had been removed from Biological Parents' home for approximately two years and that Father[3] had not seen the child since December 22, 2003.[4] The court ordered Christopher to remain with Foster Parents.

On September 29, 2005, the juvenile court held a hearing to review Christopher's case. Neither Mother nor Father appeared at the hearing because, according to Christopher's grandparents, they were "traveling with the carnival." By order entered November 17, 2005, the juvenile court held that physical custody of Christopher was to remain with Foster Parents and "visitation rights of [Biological Parents] are suspended pending further order of the Court." Approximately two years later, another dependency hearing was held, and on October 19, 2007, an Order was entered in the juvenile court stating that "neither [Mother nor Father] appeared." The juvenile court appointed Foster Parents as Christopher's "permanent guardians" and held that "visitation for the child's [Father] will be reserved until such time as he petitions this Court for visitation." Although Father was not present for the hearing, his attorney signed and agreed to the Order entered by the juvenile court. On February 26, 2008, the court entered an order setting Father's child support arrearage at $5,715, which Father fully paid off on September 5, 2012.

After Father confronted Christopher in the city park, on March 28, 2019, Foster Parents filed a petition for civil contempt and for a restraining order against Father. In response, Father filed a petition for visitation in the juvenile court,[5] and on April 4, 2019, Foster Parents filed a petition to terminate parental rights and for adoption alleging abandonment by failure to visit, abandonment by failure to pay child support, and persistence of conditions. On May 29, 2019, Father, through counsel, filed an answer to the termination petition generally denying the grounds for termination of his rights but raising no affirmative defenses. The Chancery Court of Lewis County held a hearing on the termination petition on August 26, 2020. Foster Parents, Father, and Christopher's guardian ad litem were present—all parties were represented by counsel. The chancery court held, in relevant part:

> f. From February 2005 until April 2016 when [Father] encountered Christopher at the city park in Hohenwald, he exercised not a single visit with his child.

---

[3] Mother is not a party to this appeal.

[4] Father testified that he believed he had some sporadic visitation with Christopher at the "DHS office" in 2006.

[5] There is nothing in the record to suggest Father pursued his Petition for Visitation after Foster Parents filed their Petition to Terminate Parental Rights.

g. Neither [Mother] nor [Father] ever exhibited any interest whatsoever in getting Christopher back into their custody or establishing and exercising visitation with their child.

. . .

i. Christopher has lived his whole life in the home of the Petitioners, except for a [sic] short period when he was very young, and he has integrated into the home, is considered the son of the Petitioners, brother to his siblings, and photographs were introduced to show not only his acceptance into the large family but the love and gifts that the family shower upon him.

k. Christopher has an intellectual disability that requires structure and patience. He cannot follow directions well, and he has a speech and language impairment. He plays sports in high school, and the school has been very good to work with him. He is in the CDC class in high school, and he is in the low range of intellectual capacity. [Foster Mother] has attended all IEP meetings and worked with the teachers to establish goals and expectations for his improvement throughout the years. He has integrated well within his social setting and he has two friends who frequently stay overnight at the Petitioners' home. . . .

The Court carefully viewed the testimony of [Father] and made every effort to consider inconsistencies in his favor but simply could not find [biological father] credible in his testimony. [Father] did not visit his son for at least twelve years and possibly more. . . . In fact, [Father] had no meaningful contact with Christopher at any point during Christopher's entire life. The Court specifically finds that in terms of visitation, [Father] is simply not a credible witness.

Applying the facts to the grounds for termination, the court terminated Father's parental rights on the ground of abandonment by failure to visit. The court determined:

Without question, [Father] failed to visit Christopher for a period four months preceding the filing of the petition to terminate, with the visit at the park being marginally token visitation. In fact, he has not visited or even seen the child for at least twelve (12) years. . . . From the testimony and the entire record, the Court cannot find a single shred of evidence that the failure of [Father] to visit Christopher was grounded in circumstances outside of his control or due to measures taken by [Foster Parents] or any third party.

The court held the ground of termination for abandonment by failure to support was not proven by clear and convincing evidence. The ground of persistence of conditions was dismissed at the hearing. The Court went on to review the best interest factors and found

that, after weighing all factors, termination of Father's rights was in the best interest of the child.

Father appeals and presents the following issues on appeal: whether the trial court erred in determining that his failure to visit Christopher was willful and whether the court erred in determining that termination of his parental rights was in the best interest of the child.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972); *In re Angela E.*, 303 S.W.3d 240, 249-50 (Tenn. 2010). Although this right is fundamental, it is not absolute and may be terminated in certain situations. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has identified "'those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B., IV.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)).

Tennessee Code Annotated section 36-1-113 provides the grounds and procedures for terminating parental rights. First, a petitioner seeking to terminate parental rights must prove that at least one ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Angela E.*, 303 S.W.3d at 251. Second, a petitioner must prove that terminating parental rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The termination of a parent's rights is one of the most serious decisions courts make because "[t]erminating parental rights has the legal effect of reducing the parent to the role of a complete stranger," *In re W.B., IV*, 2005 WL 1021618, at *6, "and of 'severing forever all legal rights and obligations of the parent or guardian.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(l)(1)). Consequently, a parent has a constitutional right to fundamentally fair procedures during termination proceedings. *In re Hannah C.*, No. M2016-02052-COA-R3-PT, 2018 WL 558522, at *2 (Tenn. Ct. App. Jan. 24, 2018) (citing *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016)).

Before a parent's rights may be terminated, a petitioner must prove both the grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In*

*re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at \*2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

We review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *In re Serenity B.*, 2014 WL 2168553, at \*2. In light of the heightened standard of proof, we must then make our own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524. In addition, this Court has repeatedly emphasized the deference afforded to a trial court's credibility determination:

> "The credibility of witnesses is a matter that is peculiarly within the province of the trial court. That court has a distinct advantage over us: it sees the witnesses *in person*. Unlike an appellate court—which is limited to a "cold" transcript of the evidence and exhibits—the trial court is in a position to observe the demeanor of the witnesses as they testify. This enables the trial court to make assessments regarding a witness's memory, accuracy, and, most importantly, a witness's truthfulness. The cases are legion that hold a trial court's determinations regarding witness credibility are entitled to great weight on appeal. In the absence of unrefuted authentic documentary evidence reflecting otherwise, we are loathe to substitute our judgment for the trial court's findings with respect to the credibility of the witnesses."

*In re E.L.R.*, No. E2014-00394-COA-R3-PT, 2014 WL 6735394, at \*6 (Tenn. Ct. App. Dec. 1, 2014) (quoting *Lockmiller v. Lockmiller*, No. E2002-02586-COA-R3-CV, 2003 WL 23094418, at \*4 (Tenn. Ct. App. Dec. 30, 2003) (emphasis in original; internal citations omitted)).

ANALYSIS

I. Ground for termination:  abandonment by failure to visit.[6]

---

[6] The Tennessee Supreme Court has held that "in an appeal from an order *terminating* parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether *the parent* challenges these findings on appeal." *In re Carrington*, 483 S.W.3d at 525-26 (emphasis added). This review is intended to "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures." *Id.* at 525. However, this Court has not interpreted *In re Carrington* to mean that we must also review grounds that the trial court found were *not* sufficiently proven when the party who sought termination does not challenge that ruling on appeal. *See, e.g.*, *In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at  \*2 n.5, \*4 (Tenn. Ct. App. July 23, 2018) (limiting review on appeal to "each ground for termination that the trial court found the Department established by

- 6 -

A parent's rights may be terminated for abandoning his or her child. Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102(1)(A) provides five alternative definitions of "abandonment," but only the definition provided in subsection (i) is relevant in this case. Subsection (i) defines "abandonment" as:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A). A failure to visit occurs when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period[.]" Tenn. Code Ann. § 36-1-102(1)(E). "'[T]oken visitation'" is "visitation, under the circumstances of the individual case, [that] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" Tenn. Code Ann. § 36-1-102(C).

Prior to July 2018, a petitioner seeking to terminate a parent's rights based on abandonment bore the burden of proving that the parent's failure to visit was "willful." *See* Tenn. Code Ann. § 36-1-102(1)(A)(i) (2016). The Tennessee General Assembly amended Tenn. Code Ann. § 36-1-102(1)(A)(i) on July 1, 2018, removing the willfulness requirement from the definition of abandonment by failure to visit. *See* 2018 TENN. PUB. ACTS ch. 875. The statute now provides that lack of willfulness is an "affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I). Thus, the parent now bears the burden of proving by a preponderance of the evidence that his or her failure to visit was not willful. *Id.*; *In re Braelyn S.*, No. E2020-00043-CAO-R3-PT, 2020 WL 4200088, at *4 (Tenn. Ct. App. July 22, 2020).

---

clear and convincing evidence" but omitting analysis of another ground that the trial court found was not proven where DCS did not challenge that ruling on appeal); *In re Zayne P.*, No. W2017-01590-COA-R3-PT, 2018 WL 2041573, at *6 (Tenn. Ct. App. Apr. 30, 2018) (concluding that "the mandate from *In re Carrington H.* to review all grounds on which termination of parental rights is based does not apply" and the Court of Appeals "need not consider the grounds that were not proven" when the trial court declines to terminate parental rights). Because the trial court found in favor of Father on the ground of abandonment by failure to support and dismissed the ground of persistence of conditions, and those rulings are not challenged on appeal, this Court is not required to review the trial court's findings on those grounds for termination. *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *5 (Tenn. Ct. App. Oct. 29, 2018).

As an initial matter, we note that Father did not raise his lack of willfulness as an affirmative defense in his answer to Foster Parents' termination petition. Therefore, pursuant to Tenn. Code Ann. § 36-1-102(1)(I), he waived the absence of willfulness as a defense to the ground of abandonment by failure to visit. *See* TENN. R. CIV. P. 12.08 (specifying that, in general, defenses not raised by motion or answer are waived); *see also In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021) (finding a father who failed to plead the absence of willfulness in his response to the petition to terminate parental rights waived it as a defense to the ground of abandonment by failure to support). However, Foster Parents did not object to testimony regarding willfulness at trial, and the trial court carefully considered Father's argument that his lack of visitation was not willful in its written opinion. *See* TENN. R. APP. P. 36(a); *see also In re Braelyn S.*, 2020 WL 4200088, at *4 n.3 (citing *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997) (discussing the standard for trial by implied consent)). Moreover, Foster Parents did not raise any argument in their brief that Father waived the affirmative defense of lack of willfulness. Therefore, any argument as to Father's failure to properly plead the affirmative defense regarding willfulness has been likewise waived on appeal. *See* Tenn. R. APP. P. 13(b); *see also Watson v. Watson*, 309 S.W.3d 483, 497 (Tenn. 2009) ("The appellate court may treat issues not raised on appeal as being waived.").

When considering "willfulness" in the context of the parental termination statutes, we have previously explained "willfulness" as follows:

> Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*In re Audrey S.*, 182 S.W.3d at 863-64 (citations and footnotes omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

In the present case, Foster Parents filed the termination petition on April 4, 2019. Thus, the relevant four-month period for determining whether Father abandoned the child under Tenn. Code Ann. § 36-1-102(1)(A)(i) is December 4, 2018 through April 3, 2019. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct.

App. Feb. 20, 2014) (holding that the applicable four-month time period is "the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed"). The evidence shows that Father agreed to leave his son in the custody of Foster Parents, who were complete strangers. Since that time, he has had hardly any meaningful visitation with Christopher whatsoever. Father asserted that his failure to visit was not willful because "he could not find" Foster Parents. The trial court dispelled Father's arguments regarding his lack of willfulness as follows:

> In addition, the father's arguments that his failure to visit was not willful in that he could not find [Foster Parents] to establish visits lacks the slightest hint of credibility. [Father] is a truck driver who travels the entire United States according to his testimony. He is not someone who is incapable of finding his way around. [Foster Parents have] lived most of Christopher's seventeen years in Lewis County with a population of less than 13,000. To think that in a small rural community no one could possibly know where [Foster Parents] lived is ludicrous, in addition to lacking credibility. [Father's] step-daughter even went to school with Christopher and was able to identify him at the park. In addition, [Foster Parents] own and operate a construction company with various signs around the community advertising with their name and phone number. . . .

> It is not difficult for this Court, upon hearing the testimony of [Father], witnessing his demeanor, lack of consistency in his testimony, and casual nature of the distilled desire to visit his child, to discern from the circumstantial evidence, including [Father's] total lack of concern for this child, that any visits were merely token visitation and that his failure to visit could be nothing other than willful.

In the years since he left Christopher in Foster Parents' custody Father has lived in Texas, Arkansas, Ohio, and various residences in Tennessee. In light of his frequent displacement, it would have been far more difficult for Foster Parents to keep track of him than for Father to find Foster Parents. The record shows that Father made no significant effort to visit with Christopher in the twelve years before the termination petition was filed. Importantly, the "visit" with Christopher at the city park "constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(C). We agree with the trial court that Father failed to prove that his failure to visit Christopher was not willful. Therefore, we conclude that the trial court properly terminated Father's parental rights pursuant to the grounds of abandonment by failure to visit.

## II. Best interest.

Having determined that clear and convincing evidence of at least one statutory ground exists to terminate Father's parental rights, we must next consider whether the trial court properly determined that termination of Father's parental rights was in Christopher's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. A finding that at least one ground for termination of parental rights exists does not necessarily require that a parent's rights be terminated. *In re Audrey S.*, 182 S.W.3d at 877. Because some parental misconduct is redeemable, our termination of parental rights statutes recognize that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* A court must view the child's best interest from the perspective of the child, not that of the parent. *Id.* at 878. The facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). Once a court makes the underlying factual findings, it should "consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.* at 555-56.

When considering whether terminating a parent's rights to a child is in the child's best interest, a trial court must consider the factors enumerated in Tenn. Code Ann. § 36-1-113(i).[7] A trial court is not required to find that each of the enumerated factors exists before concluding that it is in the best interest of the child to terminate a parent's rights. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Although in some circumstances "the consideration of one factor may very well dictate the outcome of the analysis," *In re Audrey S.*, 182 S.W.3d at 878, a court is still obligated to consider "all the factors and all the proof," *In re Gabriella D.*, 531 S.W.3d 662, 682 (Tenn. 2017).

After considering the relevant best interest factors, the trial court found that the factors favored terminating Father's parental rights. *See* Tenn. Code Ann. § 36-1-113(i). The evidence in the record before us does not preponderate against the trial court's findings of fact.

The first best interest factor considers whether a parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best

---

[7] The Tennessee General Assembly amended the statutory best-interest factors in 2021. *See* 2021 TENN. PUB. ACTS ch. 190 § 1 (S.B. 205), eff. April 22, 2021. However, the factors applicable to this appeal are the nine factors identified in Tenn. Code Ann. § 36-1-113(i) (2019), which were in effect when the termination petition was filed on April 4, 2019. The trial court made specific findings regarding six of the nine best interest factors, determining that factors two, six, and seven were not applicable in this case. We agree with the trial court that factor two does not apply because Father was not given (and did not request) assistance from a social services agency; however, we consider factors six and seven in the body of the opinion.

interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). Regarding his home, Father testified that for the past six months he has rented a home with his current wife. Two children reside in the home who are unfamiliar to Christopher. Father testified that he is unemployed and has no income. He explained that his CDL license and driver's license were both suspended. Father relies on his mother or medical transport for transportation because his wife also does not have a driver's license. The trial court considered this factor to weigh against Father. The evidence does not preponderate against the trial court's findings regarding this factor.

Next, the trial court considered whether Father maintained regular visitation and had a meaningful relationship with the child. *See* Tenn. Code Ann. § 36-1-113(i)(3), (4). As discussed above, the evidence in the record shows that Father did not maintain regular visitation with the child, and he had no relationship with the child for at least the previous twelve consecutive years. This factor weighs heavily in favor of terminating Father's parental rights.

The trial court found that the fifth best interest factor was "significant" and weighed in favor of termination. This factor considers "[t]he effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition." Tenn. Code Ann. § 36-1-113(i)(5). The child has lived with Foster Parents since he was about three months old. Photographs introduced at trial show Christopher has been lovingly supported in a happy home environment with Foster Parents for the past seventeen years. Indeed, Christopher has bonded with Foster Parents' biological children and considers them his siblings. A change in caretaker would be difficult for any child under these circumstances, but the adjustment would be particularly difficult for Christopher, who is a special needs child. A Psychoeducational Evaluation of Christopher was entered into evidence and identified him as having an intellectual disability that caused adverse impacts with regard to his problem-solving abilities, information processing, academic achievement, and his ability to navigate day-to-day demands. Testimony at trial showed that, in addition to his intellectual disability, Christopher is also resistant to change. Father testified he was unaware that Christopher suffered from any of these issues. We agree with the trial court that changing the child's environment would likely have a negative effect on his emotional and psychological wellbeing. Factor five weighs in favor of termination.

The trial court held that the sixth statutory factor "did not apply to the facts of this case." Best interest factor six is "[w]hether the parent, or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household." Tenn. Code Ann. § 36-1-113(i)(6). No evidence was presented that Father or anyone in his home engaged in abusive behavior. However, in April 2005, the Lewis County Juvenile Court adjudicated Christopher "dependent and neglected within the meaning of the law" finding, "[biological parents] have not been proper parents to this

baby. [Father] has not seen the child since December 22, 2003." Based on this finding from 2005, we conclude that Father has previously been neglectful to the child. Nevertheless, sixteen years have lapsed since Christopher was adjudicated dependent and neglected, and no evidence was presented that suggested Father recently engaged in any abusive conduct. In light of this, factor six is neutral or slightly weighs against termination.

The trial court also found the seventh best interest factor was inapplicable here. Factor seven concerns the "physical environment" of the parent's home and whether it is "healthy and safe" and free from criminal conduct and alcohol and drug abuse. *See* Tenn. Code Ann. § 36-1-113(i)(7). There was no evidence or testimony regarding Father's drug or alcohol use. Likewise, there was no testimony regarding any criminal activity in his home. In the absence of evidence about the physical environment of his home and because there was no evidence to indicate he abused drugs, alcohol, or engaged in criminal activity, we must conclude that factor seven weighs against termination. *See In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *20 (Tenn. Ct. App. Apr. 14, 2020) (holding that certain factors weighed against termination when no evidence was adduced regarding them).

The eighth best interest factor considers whether the parent's mental or emotional status would be detrimental to the child or prevent the parent from providing "safe and stable care and supervision for the child." *See* Tenn. Code Ann. § 36-1-113(i)(8). There was very little direct evidence presented regarding Father's mental and emotional status. However, regarding this factor, the trial court stated, "the testimony is clear that [Father] is not in a stable environment and that his emotional status [is] questionable. His being unable to recognize limitations in Christopher in his recent meeting is evidence that he could not provide safe and stable care or proper supervision for Christopher." Regarding Father's ability to provide "stable care," the trial court further stated that he "never stayed in any one place very long and changed his residence from state to state and county to county so much that he could not give credible and reliable responses to questions about where he lived at any given time." The evidence does not preponderate against the trial court's findings in this regard.

The ninth best interest factor considers whether the parent "has paid child support consistent with the child support guidelines." Tenn. Code Ann. § 36-1-113(i)(9). The record shows that Father paid off a child support arrearage but that he did not pay any other amount of child support over the prior sixteen years. Father testified:

Q: Okay. And you realize that you had an obligation to financially support Christopher after 2007, right?
A: I do now.
Q: Well, you did then, didn't you?
A: Well, like I said, I was not in the right place back then.
Q: Okay. I mean, who else would have that responsibility but you?

A: Me. That's it.
Q: Okay. So you knew you had the responsibility but you didn't send money to court, you didn't ask anybody in Hohenwald where [Foster Parents] lived, you didn't –
A: That's right.
Q: -- contribute anything financially –
A: That's correct.

Factor nine favors termination.

After considering the entire record and weighing the best interest factors, we conclude that the combined weight of the proof establishes by clear and convincing evidence that termination of Father's parental rights was in the child's best interest. As this Court has consistently recognized, "[o]ften the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest." *In re London B.*, 2020 WL 1867364, at *12.

### CONCLUSION

We affirm the trial court's termination of Father's parental rights on the ground of abandonment by failure to support and affirm the trial court's conclusion that termination of his parental rights is in the best interest of the child. Costs of appeal are assessed against the appellant, Brian L., for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE